**Malama MAKUA, a Hawai'i nonprofit corporation, Plaintiff,**

v.

**Donald H. RUMSFELD, Secretary of Defense; and Thomas E. White, Secretary of the United States Department of the Army, Defendants.**

**No. CIV.00–00813 SOM–LEK.**

United States District Court, D. Hawaii.

July 16, 2001.

**1204**

Paul H. Achitoff (present, but did not argue), David L. Henkin (argued), Honolulu, HI, for Plaintiff.

Theodore Meeker (present, but did not argue), Assistant U.S. Attorney, Office of the United States Attorney, Honolulu, HI, Ltc. David Howlett (argued), Environmental Law Division U.S. Army Legal Services Agency, Arlington, VA, for Defendants.

## ORDER GRANTING PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

MOLLWAY, District Judge.

### INTRODUCTION.

Plaintiff Malama Makua's ultimate goal in this case is an order compelling Defendants to prepare an environmental impact statement ("EIS") addressing the effects of military training with live ammunition at the Makua Military Reservation ("MMR") in west Oahu. The matter is now before the court on Malama Makua's motion for an order preliminarily enjoining such training until a final judgment is entered in this case. The court GRANTS the motion.

Malama Makua challenges the Supplemental Environmental Assessment for Routine Training at Makua Military Reservation and PFC Pililaàu Range Complex Hawaii ("SEA") and Finding of No Significant Impact ("FONSI"), issued by the United States Department of the Army on May 15, 2001. Malama Makua asserts that the SEA and FONSI violate the National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4321–4370e, in concluding that the proposed live-fire training at MMR does not have even the potential to significantly affect the environment. Malama Makua now moves to enjoin Defendants Donald H. Rumsfeld and Thomas E. White (collectively the "Army")[1] from conducting live-fire training at MMR until this case has been resolved.

Because Malama Makua raises serious questions going to the merits of this case, and because the balance of hardships tips decidedly in favor of Malama Makua, the court enjoins the Army from conducting live-fire training at MMR. This injunction will be in effect for only a few months. The court will hear motions that may resolve the entire case, one way or the other, on October 29, 2001. This injunction will be in effect only until the court decides those motions.

### FINDINGS OF FACT.[2]

#### Makua Military Reservation.

1. MMR is situated in Makua and Kahanahaiki Valleys, and lies approximately

---

1. This action was originally brought against former Secretary of Defense, William Cohen, and former Secretary of the United States Department of the Army, Louis Caldera. Pursuant to Fed.R.Civ.P. 25(d)(1), Donald H. Rumsfeld, the current Secretary of Defense, is automatically substituted as the proper defendant for William Cohen. Likewise, Thomas E. White, the current Secretary of the United States Department of the Army, is automati-

cally substituted as the proper defendant for Louis Caldera.

2. To the extent that any finding of fact stated herein may include or more properly be designated as a conclusion of law, it shall be deemed to be a conclusion of law as well. Similarly, to the extent that any conclusion of law stated herein may include or more properly be designated as a finding of fact, it shall

38 miles northwest of Honolulu on the western shore of Oahu near Kaena Point. *See* SEA at 1, attached as Ex. G to Plaintiff's Motion for Preliminary Injunction (June 11, 2001). It is bordered to the west by the Pacific Ocean, and surrounded by the Waianae Mountains to the north, east, and south. *See id.* It is approximately three miles north of Makaha, the nearest town. *See id.*

2. The Army has used MMR since 1943 as a training area for troops from the Army, other branches of the military, and foreign nations. *See id.* In 1985, the Army prepared an Environmental Assessment ("EA") and FONSI for its use of MMR. *See id.* at 2. At that time, there was no formal military range in Hawaii at which the Army could conduct company-level, maneuver, live-fire training in a safe and realistic combat environment. *See id.* The 1985 EA addressed the need at the time and the future need for soldiers to train in the successful detection, recognition, and engagement of enemy targets. *See id.* The proposed action evaluated in the 1985 EA was the construction of a formal live-fire range at MMR to support company-size military units using all of the company's available weapon systems and tactics. *See id.*

3. The Army built a Company Combined Arms Assault Course ("CCAAC") at MMR in 1988 for infantry training. *See id.* at 1. For the next 10 years, various military units conducted live-fire and combined arms maneuver training at MMR. *See id.*

*Suspension of Training.*

4. In September 1998, several wildland fires at MMR were started by munitions that fell outside the designated impact areas. *See id.* The Army temporarily stopped training at MMR as a result. *See*

*id.* The Army then began an extensive investigation into the potential effects of wildland fires on the environment and re-evaluated its fire-management plan and training procedures. *See id.*

5. The Army consulted with the United States Fish and Wildlife Service ("FWS") pursuant to section 7 of the Endangered Species Act ("ESA"), 16 U.S.C. § 1536. *See* SEA at 1. The Army and FWS discussed ways to identify, evaluate, and reduce the impact of Army activities on threatened and endangered species. *See id.* No military training has taken place at MMR since September 1998. *See id.* at 8.

6. On October 9, 1998, Malama Makua sued the Army, seeking to compel preparation of an EIS addressing all of the Army's training and training-related operations at MMR. *See Malama Makua v. Cohen,* Civil No. 98–00817 DAE (D.Haw.). The lawsuit resulted in a Stipulated Dismissal and Order in which the Army agreed not to conduct any military training activities at MMR until 30 days after the completion of a NEPA document that addressed all activities that the Army proposed to resume at MMR. *See* Stipulated Dismissal and Order ("Stipulated Order") at 2–3, attached as Ex. K to Malama Makua's Memorandum in Opposition to Federal Defendants' Motion to Continue Plaintiff's Motion for Preliminary Injunction.

7. The Army published a Draft SEA for Routine Training at MMR and PFC Pililaàu Range Complex ("DSEA") on September 23, 2000. *See* Declaration of Colonel William R. Puttmann, Jr. ("Puttmann Dec.") ¶ 3, attached to Defendants' Cross–Motion to Dismiss. On September 25, 2000, the Army held a community meeting to announce the availability of the DSEA

be deemed to be a finding of fact as well. The findings of fact include findings only on those

issues necessary for and relevant to this ruling.

and to solicit public comment and participation. *See id.* At the community's request, the Army held a second community meeting on October 11, 2000. *See id.* Following the comment period on the DSEA, the Army reviewed, considered, and responded to more than 130 comments that it had received. *See id.*

8. On December 14, 2000, the Army held a public meeting to announce the completion of its SEA and FONSI for routine military training at MMR. *See id.* ¶ 4. The December 2000 SEA "evaluated all available data" and "determined that the implementation of the proposed action would have no significant impact on the quality of the natural or human environment." *See* December 2000 FONSI at 4, attached as Ex. B to Malama Makua's Motion for Preliminary Injunction (December 21, 2000). The December 2000 FONSI concluded that "because no significant impacts would result from implementing the proposed action an [EIS] is not required and will not be prepared." *Id.*

9. The Army announced that a community meeting would be held in January 2001 to receive public comments that would be considered before the Army decided whether to resume training at MMR. *See* Puttmann Dec. ¶ 4. The Army described the December 2000 SEA and FONSI as its "initial findings and decision," and "not a final decision." *See* Statement from the Public Meeting held on December 14, 2000 at B–2, B–5, attached as Ex. B to Defendants' Reply to Plaintiff's Opposition to Defendants' Motion to Dismiss.

**The Present Lawsuit.**

10. On December 20, 2000, Malama Makua filed this action against the Army, challenging the December 2000 SEA and FONSI, and the Army's decision not to prepare an EIS relating to the resumption of training at MMR. Malama Makua filed a motion for preliminary injunction on De-

cember 21, 2000, seeking to enjoin the Army from resuming live-fire training at MMR pending final disposition of this action.

11. The Army held an open house at MMR on January 20, 2001. *See* Puttmann Dec. ¶ 5. The public was invited to the open house and encouraged to ask questions regarding the December 2000 SEA and FONSI. *See id.* Over 150 people attended this open house. *See id.*

12. The Army also held a community meeting at the Waianae Community Center on January 27, 2001, to receive public comment on the December 2000 SEA and FONSI. *See id.* ¶ 6. Over 500 people attended this meeting. *See id.* The Army received oral testimony from 64 individuals and written comment from an additional 677 people. *See id.*

13. Upon review of the public comment on the December 2000 SEA and FONSI, the Army determined that at least 15 issues raised by the public required further consideration and might require a modification of the December 2000 SEA and reconsideration of the FONSI to address community concerns adequately. *See id.* The Army therefore withdrew the December 2000 SEA and FONSI on February 7, 2001. *See id.* At that time, the Army stated that it had not yet decided whether it would resume live-fire training at MMR. *See id.* ¶ 8. The Army said that reconsideration of the December 2000 SEA and FONSI would result in either a determination to prepare an EIS or issuance of the same or a revised SEA and FONSI. *See id.*

14. After withdrawing the December 2000 SEA and FONSI, the Army moved to dismiss this case. The Army argued that Malama Makua's claims were not ripe for judicial review, or, in the alternative, that Malama Makua's claims had been rendered moot by the Army's withdrawal of

the December 2000 SEA and FONSI. On March 1, 2001, the court denied the Army's motion to dismiss, ruling that Malama Makua's claims were ripe when the lawsuit was filed and that the Army had not met its burden of showing that the withdrawal of the December 2000 SEA and FONSI rendered this case moot. The court stayed the litigation pending the earlier of the Army's decision regarding the completion of a final NEPA document or May 29, 2001.

**The SEA and FONSI.**

15. On May 15, 2001, the Army issued a new SEA and FONSI. *See* SEA; FONSI, attached as Ex. A to Plaintiff's Motion for Preliminary Injunction (June 11, 2001). The action proposed in the SEA and FONSI is company-level, maneuver, combined arms live-fire exercise ("CALFEX") training at the CCAAC at PFC Pililaàu Range Complex at MMR. *See* FONSI at 1. Under its proposal, the Army would limit training to company-size units and reduce the training area. *See id.* TOW missiles, incendiary munitions, and tracers would no longer be used at MMR. *See id.* The proposal includes wildland fire management, endangered species and cultural resource protection measures, and an Integrated Training Area Management ("ITAM") program. ITAM is designed to control soil erosion, evaluate the impact of training, develop new measures to minimize the stress imposed on the land by training, and repair damage caused by training. *See id.* at 1–2. The proposed action does not include any disposal of hazardous wastes at MMR. *See id.* at 2.

16. In a CALFEX, a light infantry company is augmented by a combat engineer squad, and supported by battalion mortars and direct support artillery. *See id.* When available, attack and assault lift helicopters will participate. *See id.* A typical CALFEX under the proposed plan will last five days. *See id.* On the first day, the infantry company and supporting units (100 to 200 soldiers) will arrive at MMR. *See id.* Key leaders will be briefed on the cultural and natural resources at the site and the steps necessary to protect them from damage, including fire damage. *See id.* On the remainder of the first day and on the second day, the soldiers will be instructed and will plan and practice their exercise without firing live ammunition. *See id.* On the third and fourth days there will be a live-fire exercise. *See id.* The actual exercise will start with the infantry company's use of indirect fire against a target. *See id.* The infantry company will then advance on foot toward the target, firing weapons while advancing. *See id.* The company will occupy the target and prepare for an enemy counterattack. *See id.* The exercise will end on the fifth day with cleaning of the range. The Army will try to restore the area to its pre-existing condition. *See id.* This will include gathering brass casings from spent rounds, removing litter, and destroying all unexploded ordnance ("UXO"). *See id.* The soldiers will then return to Schofield Barracks. *See id.* The company CALFEX is the largest exercise that will be conducted at the CCAAC, but the facility may be used to conduct smaller exercises with similar activities applying the same environmental protections. *See id.*

17. The weapons that the Army proposes to use at MMR include small arms (rifles, pistols, machine guns, shot guns, and helicopter guns), mortars and artillery firing high explosives ranging from 60mm to 120mm, anti-tank weapons firing 66mm to 84mm high-explosive anti-tank rockets, shoulder-launched multi-purpose assault weapons, smoke grenades, fragmentation and offensive grenades, demolitions of up to 300 pounds net explosive weight, Bagalore torpedoes, a variety of anti-personnel and anti-tank mines, and a variety of pyrotechnics to simulate ground burst, artillery

flashes, booby traps, and hand grenades. *See* SEA at 22.

18. The SEA identifies six alternatives to the proposed action: (1) no action; (2) training at Pohakuloa Training Area; (3) training at facilities in the continental United States; (4) resumption of the pre-September 1998 level of training at MMR; (5) use of MMR for training without live fire; and (6) construction of a replacement facility at another Army installation on Oahu. *See id.* at 25–39. The SEA concludes that there are "no reasonable alternatives to the proposed action." *See id.* at vi.

19. The FONSI states that the SEA has evaluated all data concerning the effects of the proposed action on land use, soils and geology, vegetation, wildlife and endangered species, air quality and the noise environment, transportation, and socioeconomics. *See* FONSI at 6. In every case, the Army found the environmental impact not to be significant. *See id.* Based on the SEA, the Army determined that the proposed action would have no significant direct, indirect, or cumulative impact on the quality of the natural or human environment. *See id.* Because the Army found no significant impact from implementation of the proposed action, it concluded that an EIS is not required and will not be prepared. *See id.*

### Potential Threat to Endangered Species.

20. As noted above, the Army initiated a formal consultation under section 7 of the ESA with FWS in 1998 to determine if routine military training at MMR would jeopardize the continued existence of 41 endangered species. *See* SEA at 68. On July 23 1999, FWS issued a Biological Opinion concluding that routine military training would not likely jeopardize the continued existence of endangered species in Makua if certain conditions were implemented. *See id.* To minimize the impact on endangered species, the Army would

have to restrict training in certain ways, prepare and implement a fire plan called the "Wildfire Management Plan," and implement a plan called the "Makua Endangered Species Mitigation Plan" ("ESMP"). *See* FWS Biological Opinion for Routine Military Training at MMR (July 23, 1999) ("BO") at 34, attached as Ex. E to Plaintiff's Motion for Preliminary Injunction (June, 11, 2001).

21. The SEA indicates that there are at least 32 listed endangered plants, two endangered birds (the "Oahu creeper" and the "Oahu elepaio"), one endangered mammal (the "Hawaiian hoary bat"), and one endangered invertebrate snail (the "Oahu tree snail") located in MMR. *See* SEA at 63. Some of these species may no longer exist at Makua. *See id.* For example, the Oahu creeper has not been seen since the 1970s. *See id.* No threatened species is known to exist at Makua. *See id.*

22. In addition to the listed species, there are records of 10 plant species recognized as species of concern, five plant candidate species recognized for threatened or endangered species status, and one animal species of concern present on Makua. *See id.* Candidate species are species that may be warranted for listing as threatened or endangered by FWS, but insufficient information has been obtained by FWS to justify their listing. *See id.*

23. Wildfire from training activities is the single largest potential impact on the Makua Valley ecosystem. *See id.* at 69. Wildfires may threaten the existing ecosystem and affect the Army's training mission. *See id.* If fire consumes native vegetation, especially trees that provide overstory shade, alien weeds can more easily take over, extending the grass boundary and increasing the risk to endangered species. *See id.* Native Hawaiian plants are not known to reclaim areas devastated by fire. *See id.*

24. Wildfires influence the ecosystem directly and indirectly by altering the distribution of plants and animals, accelerating or retarding the succession of stages, making nutrients available or scarce to plants, and changing habitat structure and forage composition. *See id.* Although fires and decomposition are two processes that remove woody debris from the system, fire can also disturb watersheds by creating areas of bare mineral soils susceptible to runoff and erosion, particularly in Hawaii, where the vegetation has not adapted to fire. *See id.*

25. Wildfires can easily overtake soldiers training in the field, trapping them and causing injury or death. *See id.* Wildfires also can create extreme hazards for personnel near explosives. *See id.*

26. The Army has recognized that "[f]ires are inevitable and will start on Army training lands due to the availability of vegetative fuels and the mere nature of the Army's mission—to conduct live-fire training exercises using various types of ammunition, pyrotechnics, and weapon systems." *See* Wildland Fire Management Plan ("FMP") at 4–1, attached as Ex. H to Plaintiff's Motion for Preliminary Injunction (June 11, 2001). Over the long term, as fires destroy more trees and grassy weeds move in to replace them, the grass/forest boundary will gradually move toward these areas, to the detriment of the listed species in these areas. *See* BO at 32.

27. The Army, working with FWS, has identified 30 endangered species that would be threatened with extinction by the proposed live-fire training at MMR. *See* BO at Attachment 2, Table 4 (listing 27 plants likely to be jeopardized by military training); Amendments to BO (March 16, 2001) ("BO Amendments") at 1–5 (identifying additional endangered species requiring species-specific mitigation). The risk of extinction to these species is great because they do not satisfy FWS's criteria for "stability." *See* ESMP at 68, 70. Because the species are not stable, "the loss of a single individual could result in the extinction of the species no matter what management actions are taken for the remaining individuals" or, at a minimum, "may preclude the potential for the species to recover." ESMP at 69.

28. It is difficult to accurately analyze fire-causing trends at MMR before 1996 because most records that were kept have been destroyed in accordance with the Army's five-year retention policy. *See* SEA at 70. Some fire history from 1995 to the present is shown as Appendix G to the Biological Assessment prepared by the Army on November 2, 1998, but the information is not complete regarding the locations of all the fires, the causes, and the fire burn index reading at the time. *See* BO at 32. In 1997, there were three small fires at MMR that occurred outside the southern firebreak road. *See id.* In 1998, there were four fires that occurred outside the firebreak road, three of them started by military training. *See id.* Although no listed species died in the fires, one fire came within 30 meters (100 feet) and another came within 100 meters (328 feet) of listed plant species. *See id.*

29. Although the SEA reviews the fire history data for MMR, particularly ignition sources of past fires, the SEA does not analyze the fire history data for trends in fire occurrence, frequencies by month, and fire size. *See* SEA at 70–71. The SEA also fails to examine trends in fire behavior as influenced by varying weather conditions, topography, and fuel types. *See id.*

30. The court can find no studies or reports in the SEA that estimate the frequency, intensity, or size of fires that may occur during proposed training at MMR. There is no specific analysis of the potential risk that fires may cross the firebreak

road. The record contains no documentation of the specific areas and locations within the CCAAC that have the highest potential for fires. There is also no information regarding the time of year or season that fires are most likely to start, given the environment, weather, and growth patterns at MMR.

31. The SEA proposes several actions that the Army concludes will "substantially" reduce the possibility of fires at MMR. *See* SEA at 78–80. First, the Army has established a fire danger rating system to warn people when dangerous fire conditions are expected. *See id.* at 72. The system provides a computer-generated set of indices that forecast the ignition component (percent of fires that would start as a result of firebrands), the spread component (rate of spread), and a burn index (effort required to contain a fire). *See id.* The rating system provides the probability that a fire will start and indicates how difficult it will be to control a fire. *See id.* This information is used to control the types of training allowed on the ranges. *See id.*

32. Second, the Army plans to implement a fire management plan in consultation with FWS. *See id.* at 78. The FMP recognizes that special "environmental and land use conditions exist which make wildfire management difficult." *See* FMP at 1–1. The FMP establishes specific guidance, procedures, and protocols in the prevention and suppression of wildfires on Army training lands. *See id.* It describes how to plan standard practices for what it calls "pre-suppression" and suppression activities to protect natural and man-made resources. *See id.* The responsibilities of fire managers, staff, training units, federal firefighters, and other agencies in the prevention and suppression of fires within Makua are addressed in the Makua site-specific Wildfire Standard Operating Procedures. *See* SEA at 74.

33. The Standard Operating Procedures set forth training restrictions when the danger of fire is great. Trainers will be taught about the fragility of Native Hawaiian ecosystems and the devastating effects of fire. *See id.* Specific range boundaries for certain weapon systems have been designated. Mortars and howitzer cannon, in particular, have a potential range beyond the firebreak road. The Army proposes to limit the direction and angle at which these weapons are aimed and the amount of propellant used so that their impact will be contained within the area bounded by the firebreak road. *See id.* During training, all weapons are supposed to be aimed so that their projectiles land within the southern fire/fuel break road. *See id.* However, the surface danger zones for these weapons extend outside the firebreak road. *See id.* at 20.

34. Third, the Army will eliminate TOW missiles, incendiary munitions, and tracers from use at MMR. *See id.* at 78. These types of weapons and ammunition caused approximately 61 percent of recorded fires at MMR from 1970 through 1998. *See id.* at 71. While this proposal may reduce the number of fires at MMR, the Army's proposed training-related activities all have track records of causing fires outside the firebreak road.

35. Fourth, the Army will take steps to stabilize the area in the short-term. The Army will do this by controlling goats and pigs in certain areas, getting rid of weeds, controlling erosion, and controlling certain insects. *See id.* at 78.

36. Fifth, the Army will begin long-term stabilization measures designed to promote the continued existence of threatened and endangered species. *See id.* at 79. This includes implementing the ESMP, as required by FWS in its finding of "no jeopardy." *See* BO at 34. The ESMP proposes management actions that

are "experimental in nature." *See* ESMP at 109. The ESMP acknowledges that "success cannot be ensured at this point." *See id.* The ESMP's heavy reliance on attempts to reintroduce threatened or endangered species is "particularly risk-laden." *See id.* at 118. The ESMP notes the "low success rate of reintroduction … combined with the risk to the population due to training impacts." *See id.* at 71. The success of reintroduction is likely to take years to centuries to determine. *See id.* at 118.

37. Sixth, the Army will conduct pre-suppression activities, including fuel management and prescribed fires. *See* SEA at 78. Prescribed fires would function as a pre-suppression tool to remove vegetation and excess fuel under defined conditions. *See id.* at 79. However, prescribed fires can damage sensitive areas if the fires spread or if the burn area has not been accurately assessed before the fire begins. *See id.* "[T]here is always a potential for prescribed burning to get out of the controlled burn area outside the firebreak road, thereby potentially burning [threatened and endangered species] and their habitat." *See* BO at 32.

38. Finally, the Army will perform fire suppression activities. *See* SEA at 79. The Army recognizes that fire suppression can have a greater impact on the environment than pre-suppression activities. *See id.* The "extent, location, and time [of a fire] may be largely out of administrative control." *See id.* Firebreaks and fire lines may be placed through sensitive habitats to suppress or control wildfires that threaten extensive areas. *See id.* These actions will be taken only under emergency conditions. *See id.*

39. The Army concludes that these mitigation measures, coupled with the proposed modifications in training, permit the Army to resume live-fire training with no significant impact to the threatened and endangered species in Makua.

### *Potential Threat to Cultural Resources.*

40. "Makua," which means "parents" in Hawaiian, is considered sacred land in the Native Hawaiian culture. *See* SEA at 93–94. Before the Army took over, Native Hawaiians used Makua Valley extensively for traditional cultural uses. *See id.* Historical records, oral histories, and archaeological studies dating back to the 19th century document the cultural heritage of the area, including both religious and domestic use of Makua by Native Hawaiians. *See id.*

41. Makua Valley is associated with a number of Native Hawaiian legends and traditional Native Hawaiian deities. *See id.* It has significant religious and social value to many Native Hawaiians. *See id.* Dozens of archaeological, cultural, and historic sites have been identified at MMR, including Native Hawaiian burial areas, heiau (Native Hawaiian temples), and agricultural features. *See id* at 93–94, 110–17. Only 25 percent of the entire MMR has been surveyed for archaeological and cultural sites. *See id.* at 117. However, the 25 percent that was surveyed includes the entire CCAAC. *See* Intensive Archaeological Survey and Monitoring for Proposed Modifications to the CCAAC at MMR (May 2000) ("Archaeological Survey"), attached as Ex. I to Plaintiff's Motion for Preliminary Injunction (June 11, 2001).

42. Although the entire CCAAC was surveyed, the presence of unexploded ordnance in the area and "the necessity to have [explosive ordnance disposal] escort personnel required certain modifications to traditional archaeological methods." Archaeological Survey at 14. Certain vegetated areas also "had to be avoided because of the danger posed by UXO." *Id.* at 17. Because of the possibility of UXO, some portions of sites could not be safely

mapped. *See id.* While MMR has "the potential to contain subsurface archaeological sites that will provide important information regarding" pre-contact settlement patterns, no subsurface testing was conducted in the area of planned firebreak roads. *Id.* at 14, 80. "The remaining portion of MMR that may contain historic artifacts" is "unsafe to survey, without extensive UXO detection and demolition by Explosive Ordnance Disposal experts." *See* SEA at 117.

43. The majority of cultural sites discovered in Makua Valley are located within the firebreak road where most of the training is proposed. *See* FMP at 7–12. A 1998 report noted that explosive ordnance detonation, maneuvering activities, and vegetation clearance posed "[s]ignificant threats to archaeological sites at MMR." *See* MMR Standard Operating Procedures ("MMR SOP") (September 21, 1998) at A–1. Of these threats, "explosive detonation is the most common identified threat to cultural resources at MMR." *See* FMP at 7–12. "The use of explosive ordnance has clearly damaged archaeological sites and features within the training area." *Id.*

44. Wildland fire and fire suppression activities are a potential threat to archaeological sites at MMR. *See* MMR SOP at A–1; FMP at Annex A, App. 1 at A–2. Suppression activities such as bulldozer lines, off-road driving of vehicles, and other ground-fire suppression measures can damage cultural resources. *See id.* "Climbing and walking on archaeological features can [also] be very destructive and can result in the tumbling of stones and the alteration of integrity of the feature." *See* FMP at 7–12.

45. On September 18, 2000, the Army entered into a Programmatic Agreement ("PA") with the Hawaii State Historic Preservation Office and the federal Advisory Council on Historic Preservation pursuant to section 106 of the National Historic Preservation Act, 16 U.S.C. § 470f. *See* SEA at 117. The PA was developed in consultation with Hawaiian groups and regulatory agencies over a period of two years. *See id.* It contains specific programs and efforts to protect and mitigate the impact of training activities on cultural resources at Makua. *See id.*

46. The SEA lists some of these mitigation measures. *See id.* at 117–19. Physical barriers and exclusion areas will be established around archaeological sites. *See id.* at 118. All cultural resource areas will be marked. *See id.* Range target areas will be located away from cultural sites. *See id.* Troops who train at MMR will be instructed in the recognition and protection of cultural resources. *See id.* The Army will also continue to survey cultural areas and consult with the State Historic Preservation Office, the Advisory Council on Historic Preservation, and Native Hawaiian organizations. *See id.*

47. There is no evidence in the record regarding the potential risk that cultural resources may face from the proposed live-fire training at MMR. The Army has conducted no studies to determine the potential for fires to start near cultural sites, or the likelihood that fires will damage those sites. It appears that the Army has also not examined or studied the potential for stray ordnance to damage cultural resources. Although the Army lists several mitigation measures that it intends to implement, the Army has not studied whether these measures are likely to be effective in protecting the cultural sites in Makua.

***Impact on Hawaiian Cultural Practices.***

48. Following publication of the DSEA, the Army received several comments criticizing the Army for having failed to consider the impact of the proposed live-fire training on Native Hawaiian cultural practices, especially the practice of gathering plants and animals. *See, e.g.,* Letter from

Jonathan Deenik to Major General James Dubik, attached as Ex. Q to Plaintiff's Motion for Preliminary Injunction (June 11, 2001); Letter from Eileen Greene to Peter Yuh, attached as Ex. R to Plaintiff's Motion for Preliminary Injunction (June 11, 2001); Letter from Kyle Kajihiro to Major General James Dubik, attached as Ex. S to Plaintiff's Motion for Preliminary Injunction (June 11, 2001); Transcript of Makua Valley Public Meeting (January 27, 2001) at 156–58, 181, 226, 289–92, attached as Ex. T to Plaintiff's Motion for Preliminary Injunction (June 11, 2001).

49. A letter from the State of Hawaii Office of Hawaiian Affairs ("OHA") criticized the SEA for having failed to "evaluate the impact of its proposed action on the traditional and customary practices in Makua" and for ignoring the "impact of the proposed action on Native Hawaiian access to cultural resources," on which the "very survival of native Hawaiian culture depends." *See* Letter from Colin C. Kippen to Peter Yuh ("OHA Letter") at 2, attached as Ex. O to Plaintiff's Motion for Preliminary Injunction (June 11, 2001). OHA questioned the Army's failure to complete a traditional cultural places survey and a comprehensive archaeological survey before deciding to resume live-fire training at MMR. *See id.* OHA concluded that the Army had not "adequately address[ed] the impact of live-fire training on native plants and native Hawaiian customs, culture, and traditions[.]" *Id.* at 4.

***Potential Contamination from Hazardous Waste.***

50. The Army's past activities at MMR caused large amounts of hazardous waste to be deposited in Makua Valley. *See* SEA at 123. Over the past several decades, site assessments and environmental sampling at Makua have measured the contamination caused by the hazardous waste. *See id.*

51. In 1992, the Environmental Center of the University of Hawaii prepared a report examining the impact of the hazardous waste on Makua Valley ("UH Report"). *See* UH Report at 9, attached as Ex. U to Plaintiff's Motion for Preliminary Injunction (June 11, 2001). The UH Report stated that "approximately 50 percent (2,621.75 tons) of the total potential hazardous waste burned at [MMR] can be considered as posing a threat to the population and ecosystem, via migration in one of the pathways: groundwater, surface water, soil, and air." *See id.* at 8–9. After identifying two aquifers of concern located within a four-mile radius of MMR, the report noted that "[i]n the past, hazardous wastes may have entered the soil directly and have the potential to migrate into the upper aquifer and eventually into the groundwater." *See id.* at 9.

52. The Army discounts the UH Report in the SEA. *See* SEA at 123. The Army points to a 1994 study done by Halliburton NUS Corporation ("Halliburton Study"). *See id.* at 124–26. The Halliburton Study examined the 18 acre open burning/open detonation ("OB/OD") unit at the far end of the southern firebreak road. *See id.* at 130. The Halliburton Study was expressly limited to examining the "potential impacts associated with [the past] OB/OD operations" of the Army. *See* Halliburton Study (March 1994) at 1–1, attached as Ex. V to Plaintiff's Motion for Preliminary Injunction (June 11, 2001). The Halliburton Study recognized that "a complete characterization of environmental conditions within the entire installation for evaluating potential impacts associated with other past and present military activities is beyond the scope of the current study." *See* Halliburton Study at 1–1.

53. The Halliburton Study took groundwater and soil samples from the OB/OD unit and from outside the OB/OD

unit in other areas, including the CCAAC. *See* SEA at 124. The SEA indicates that the Halliburton Study relied on extensive soil sampling and geophysical investigation to determine the parameters under which contaminants might migrate from soil to groundwater in Makua Valley. *See id.* at 130. The study employed a sophisticated computer model to simulate migration from soil to groundwater. *See id.* The study also looked at the potential for surface water to transport contaminants to the installation boundary. *See id.* Soil samples from the dry streambed and a groundwater sample from a well that is recharged by Makua Stream were examined. *See id.* According to the Halliburton Study, none of the samples exceeded the United States Environmental Protection Agency's health criteria. *See id.* The SEA concludes that the study showed that contamination from past training activities was low, and that contaminants from the most contaminated site at Makua (the OB/OD unit) would take thousands of years to migrate to the installation boundary. *See id.* This indicated to the Army that the migration of contaminants from the adjoining training area is a slow process, and that groundwater at the installation boundary is not contaminated. *See id.* The Army therefore concluded that past training activities have not had a significant impact on the environment. *See id.* The Army reasoned that the resumption of training at MMR, at a reduced level and without use of the OB/OD unit, would not have a significant impact on the environment. *See id.*

54. A critique of the Halliburton Study, prepared by Dr. Mary Masters of Stanford University's Western Region Hazardous Substance Research Center, was submitted to the Army during the comment period on the DSEA. *See* Masters' Review (February 17, 1999), attached as Ex. W to Plaintiff's Motion for Preliminary Injunction (June 11, 2001). Dr. Masters challenges the validity of the Halliburton Study's conclusions. *See id.* at 1 (stating that the "methodology and research design of the Report fail to provide sufficient data to adequately characterize the nature and extent of soil, groundwater, and sediment contamination"). Dr. Masters questions both the "Report's conclusions regarding groundwater contamination, flow, and transport" and its "estimate of potential human health risk." *See* Masters' Review at 2. The SEA did not respond to this critique.

***Impact on the Military.***

55. The SEA identifies at least three training facilities on the mainland that can accommodate CALFEX training similar to the type of training that the Army proposes for MMR. *See* SEA at 13, 29. However, because of the distance between Hawaii and those facilities, the Army says it is difficult to conduct regular CALFEX training exercises at these facilities with sufficient frequency. *See id.* at 13, 29. If costs were not a consideration, Yakima Training Center in Washington State would be satisfactory in terms of facilities, but the Army says it would not provide the Pacific Basin and Pacific Rim environment that the 25th Infantry Division (Light) ("25th ID(L)") would likely face when deployed. *See id.* at 29.

56. In addition, the 25th ID(L) conducts live-fire training at two training facilities in Hawaii. *See id.* at 13. The Pohakuloa Training Area, on the Island of Hawaii, is the largest training area available to Army units stationed in Hawaii. *See id.* at 4. Pohakuloa, however, cannot currently support a company maneuver CALFEX to standard. *See id.* at 13. Similar, but smaller, facilities are available at Schofield Barracks on Oahu. *See id.* However, the Army states that this range lacks sufficient width and depth to meet Army design specifications. *See id.* As

currently configured, the Schofield Barracks training facility does not meet company maneuver CALFEX requirements. *See id.* at 13–14.

57. The Army estimates that only a handful of company-level CALFEX training exercises can be conducted outside the State of Hawaii annually in the future. *See id.* at 13. After training stopped at MMR, the 25th ID(L) reduced its CALFEX training by 75 percent. *See id.* The Army asserts that this continued reduction in CALFEX training will place the lives of the 25th ID(L) soldiers at risk and will damage national security. *See id.*

## CONCLUSIONS OF LAW.
### Preliminary Injunction Standard.

■ 1. To obtain a preliminary injunction, a party must demonstrate either: (1) probable success on the merits and irreparable injury; or (2) sufficiently serious questions going to the merits to make the case a fair ground for litigation, with the balance of hardships tipping decidedly in favor of the party requesting relief. *Baby Tam & Co., Inc. v. City of Las Vegas,* 154 F.3d 1097, 1100 (9th Cir.1998); *Topanga Press, Inc. v. City of Los Angeles,* 989 F.2d 1524, 1528 (9th Cir.1993), *cert. denied,* 511 U.S. 1030, 114 S.Ct. 1537, 128 L.Ed.2d 190 (1994).

■ 2. Traditionally, there were four factors to be considered in deciding whether an injunction should issue: (1) the likelihood of the plaintiff's success on the merits; (2) the threat of irreparable harm to the plaintiff if the injunction is not imposed; (3) the relative balance of the harm to the plaintiff and the harm to the defendant; and (4) the public interest. *Alaska v. Native Village of Venetie,* 856 F.2d 1384, 1388–89 (9th Cir.1988). These factors have been collapsed into the test articulated in the preceding paragraph. *See id.* However, when, as in this case, the public interest is involved, a district court must examine whether that public interest favors the plaintiff. *Fund for Animals, Inc. v. Lujan,* 962 F.2d 1391, 1400 (9th Cir. 1992).

3. The two formulations summarized in *Baby Tam* represent two points on a sliding scale, with the required degree of irreparable harm increasing as the probability of success decreases. *Baby Tam,* 154 F.3d at 1100; *Miller v. California Pac. Med. Ctr.,* 19 F.3d 449, 456 (9th Cir.1994). These formulations are not separate tests, but the extremes of a single continuum. *Baby Tam,* 154 F.3d at 1100; *Los Angeles Mem'l Coliseum Comm'n v. National Football League,* 634 F.2d 1197, 1201 (9th Cir.1980).

■ 4. "If the balance of harm tips decidedly toward the plaintiff, then the plaintiff need not show as robust a likelihood of success on the merits as when the balance tips less decidedly." *Native Village of Venetie,* 856 F.2d at 1389 (quoting *Aguirre v. Chula Vista Sanitary Serv.,* 542 F.2d 779 (9th Cir.1976)). If a plaintiff shows no chance of success on the merits, the preliminary injunction should not issue. Under any formulation, the moving party must demonstrate a "significant threat of irreparable injury." *Arcamuzi v. Continental Air Lines, Inc.,* 819 F.2d 935, 937 (9th Cir.1987). A plaintiff must do more than merely allege imminent harm sufficient to establish standing; he or she must demonstrate immediate threatened injury as a prerequisite to preliminary injunctive relief. *Associated Gen. Contractors of Cal., Inc. v. Coalition for Econ. Equity,* 950 F.2d 1401, 1410 (9th Cir.1991), *cert. denied,* 503 U.S. 985, 112 S.Ct. 1670, 118 L.Ed.2d 390 (1992).

### There Are Serious Questions Going to the Merits of This Case.
### Legal Framework of NEPA.

5. NEPA is the "basic national charter for protection of the environment." 40

C.F.R. § 1500.1(a). Congress enacted NEPA to ensure that all federal agencies would factor environmental considerations into decisionmaking. To achieve this goal, NEPA requires federal agencies to prepare an EIS for all "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C). "NEPA ensures that the agency ... will have available, and will carefully consider, detailed information concerning significant environmental impacts; it also guarantees that the relevant information will be made available to the larger [public] audience." *Blue Mountains Biodiversity Project v. Blackwood,* 161 F.3d 1208, 1212 (9th Cir.1998), *cert. denied,* 527 U.S. 1003, 119 S.Ct. 2337, 144 L.Ed.2d 235 (1999).

6. If, as here, an agency's regulations do not categorically require or exclude the preparation of an EIS, the agency must first prepare an EA to determine whether the action will have a significant effect on the environment. 40 C.F.R. § 1501.4. An EA is less comprehensive and less detailed than an EIS. *See Conner v. Burford,* 848 F.2d 1441, 1446 (9th Cir.1988); 40 C.F.R. § 1508.9. It is a document that: (1) provides sufficient evidence and analysis for determining whether to prepare an EIS or a FONSI; (2) aids in an agency's compliance with NEPA where no EIS is necessary; and (3) facilitates preparation of an EIS when one is necessary. *See* 40 C.F.R. § 1508.9(a). If the EA establishes that the agency's action "may have a significant effect upon the ... environment, an EIS must be prepared." *Foundation for N. Am. Wild Sheep v. United States Dep't of Agric.,* 681 F.2d 1172, 1178 (9th Cir.1982). If the EA indicates that the agency's action will not significantly affect the quality of the human environment, the agency issues a FONSI. *See Blue Mountains,* 161 F.3d at 1212.

7. An EIS must be prepared if "substantial questions are raised as to whether a project may cause significant degradation of some human environmental factor." *Idaho Sporting Congress v. Thomas,* 137 F.3d 1146, 1149 (9th Cir.1998) (internal quotation omitted). Thus, to prevail on a claim that the Army violated its statutory duty to prepare an EIS, Malama Makua need not show that significant effects will in fact occur. *See Blue Mountains,* 161 F.3d at 1212. It is enough for Malama Makua to raise substantial questions as to whether live-fire training may have a significant impact on the environment. *See id.*

8. In reviewing an agency's decision not to prepare an EIS under NEPA, the court employs an arbitrary and capricious standard. *See National Parks & Conservation Ass'n v. Babbitt,* 241 F.3d 722, 730 (9th Cir.2001). The court must determine whether the agency has taken a "hard look" at the consequences of its actions, based its decision on a consideration of relevant factors, and provided a " 'convincing statement of reasons' to explain why a project's impacts are insignificant." *Blue Mountains,* 161 F.3d at 1212 (quoting *Save the Yaak Comm. v. Block,* 840 F.2d 714, 717 (9th Cir.1988)). This standard of review is deferential; the court cannot substitute its judgment for that of the agency. *See Wetlands Action Network v. United States Army Corps of Eng'rs,* 222 F.3d 1105, 1114 (9th Cir.2000). The agency's decision will only be overturned if the agency made "a clear error in judgment." *Northwest Envtl. Defense Ctr. v. Bonneville Power Admin.,* 117 F.3d 1520, 1536 (9th Cir.1997) (quotation omitted).

*Uncertainty.*

9. "An agency must generally prepare an EIS if the environmental effects of a proposed agency action are highly uncer-

tain." *National Parks,* 241 F.3d at 731. "Preparation of an EIS is mandated where uncertainty may be resolved by further collection of data, or where the collection of data may prevent speculation on potential effects." *Id.* "The purpose of an EIS is to obviate the need for speculation by insuring that available data are gathered and analyzed prior to the implementation of the proposed action." *Sierra Club v. United States Forest Serv.,* 843 F.2d 1190, 1195 (9th Cir.1988).

10. Here, the scientific evidence presented in the Army's own studies reveals the potential for adverse environmental effects. Uncertainty exists, not over whether the environment will be affected, as that is certain, but over the intensity and nature of those effects. Because the Army's own studies suggest the potential for detrimental effects, Malama Makua has demonstrated sufficiently serious questions going to the merits to make the case a fair ground for litigation.

**Endangered Species.**

11. The SEA acknowledges that there is a potential threat to endangered species in Makua Valley from wildfires if the Army resumes training. The Army admits that wildfires are inevitable and will start in Makua Valley. The ammunition, pyrotechnics, and weapon systems will ignite fires, and the surrounding plants will fuel those fires. These wildfires have the potential to adversely affect the environment of Makua Valley and may threaten endangered species located there.

12. Although the Army states that there is some risk from wildfires, the SEA fails to specify and quantify that risk for the public. "[G]eneral statements about 'possible effects' and 'some risk' do not constitute a 'hard look' absent a justification regarding why more definitive information could not be provided." *Blue Mountains,* 161 F.3d at 1213 (quoting

*Neighbors of Cuddy Mountain v. United States Forest Serv.,* 137 F.3d 1372, 1380 (9th Cir.1998)). The Army's repeated statements that there is some risk of fire are not comforting. The SEA contains no specific studies or documentation of the estimated nature, size, frequency, or impact of possible wildfires under the proposed action. Even after a careful reading of the SEA, the court cannot determine: (1) the likelihood of wildfires in Makua Valley if the Army resumes training; (2) the estimated size of any wildfires that may occur; and (3) the chances that fires started by the Army will escape the firebreak road and threaten endangered species.

13. The full environmental effect of a potential fire at Makua remains largely unknown. This lack of data undermines the reliability of the SEA. It is unlikely that an agency can determine whether a proposed action would have no significant impact on the environment when the agency does not even examine or quantify the potential for adverse environmental effects.

14. The Army bases its FONSI almost entirely on the mitigation measures contained in the SEA to protect Makua against wildfires. An agency's decision not to issue an EIS may be justified in some circumstances by the adoption of such mitigation measures. *See Wetlands Action Network,* 222 F.3d at 1121. "If significant measures are taken to 'mitigate the project's effects, they need not completely compensate for adverse environmental impacts.'" *Id.* (quoting *Friends of Payette v. Horseshoe Bend Hydroelec. Co.,* 988 F.2d 989, 993 (9th Cir.1993)). In evaluating the sufficiency of mitigation measures, the court considers "whether they constitute an adequate buffer against the negative impacts that may result from the unauthorized activity." *National Parks,*

241 F.3d at 734. Specifically, the court examines "whether the mitigation measures will render such impacts so minor so as not to warrant an EIS." *Id.*

▆▆ 15. While the agency is not required to develop a complete mitigation plan detailing the precise nature of the mitigation measures, the proposed mitigation measures must be developed to a reasonable degree. *See id.* "A perfunctory description or mere listing of mitigation measures, without supporting analytical data, is insufficient to support a finding of no significant impact." *Id.*

16. The SEA contains an extensive list of mitigation measures that the Army plans to implement to limit the potential impact of live-fire training, including the Wildfire Management Plan, the fire danger rating system, elimination of certain weapons and ammunition, short-term stabilization measures, the Makua Endangered Species Mitigation Plan, pre-suppression activities, and fire-suppression actions. Although the SEA and the FMP describe these mitigation measures in some detail, the SEA contains no analysis or evidence of the effectiveness of these mitigation measures. Despite the Army's lack of data, the SEA concludes that, with mitigation measures, live-fire training would have no significant impact on threatened and endangered species.

17. The Army admits that many of the mitigation measures described in the SEA were in place before it suspended live-fire training in Makua Valley in 1998. It is clear that, despite these measures, endangered species were threatened by wildfires in the past. Without information indicating the effectiveness of the newly proposed mitigation measures, the Army cannot make a truly informed decision as to whether or not live-fire training will have a significant impact on the environment.

18. The Army argues that its FONSI is also largely based on the results of the consultation with FWS that is required by the ESA. The Army asserts that its conclusion that live-fire training will have no significant impact on endangered species in Makua Valley is supported by FWS's finding that the proposed action is not likely to jeopardize the endangered species in Makua Valley. *See Friends of Payette,* 988 F.2d at 994–95 (finding that FWS's approval of a proposed action is one factor in determining whether the proposed action will have an impact on endangered species). The Army admits that the "no jeopardy" opinion by FWS under the ESA is not equivalent to a finding of no potential impact under NEPA. The "no jeopardy" opinion says that routine training would not likely jeopardize the continued existence of endangered species, provided certain safeguards are implemented. A FONSI, by contrast, must be based on a review of the potential for significant impact, including impact short of extinction. Clearly, there can be a significant impact on a species even if its existence is not jeopardized. Nevertheless, the Army contends that the court should defer to FWS.

19. The "no jeopardy" opinion by FWS is based in part on the Army's implementation of the Makua Endangered Species Mitigation Plan. As noted above, however, it is unclear how effective the ESMP will be. As the ESMP proposes management actions that are "experimental in nature," "success cannot be ensured at this point." *See* ESMP at 109. The ESMP's heavy reliance on reintroduction efforts is "particularly risk-laden." *See id.* at 118. The ESMP notes the "low success rate of reintroduction ... combined with the risk to the population due to training impacts." *See id.* at 71. As noted above, the success of reintroduction is likely to take years to centuries to determine. *See id.* at 118.

20. The Army may ultimately be correct in arguing that live-fire training will

have no significant impact on the environment. However, Malama Makua has raised serious questions about the Army's proposed action and its proposed mitigation measures. These serious questions justify the imposition of an injunction. The SEA does not meaningfully consider certain matters fundamental to any evaluation. This failure calls into question whether the Army's decision was truly informed, as mandated by NEPA.

### Cultural Resources.

21. Additionally, the SEA fails to fully assess the risk that live-fire training poses to archaeological, historical, and cultural sites located in Makua Valley. The Army has not conducted sufficient studies to explore the potential effects of training on cultural and archaeological sites. Although the Army proposes to modify the maneuver corridors and target arrays to ensure that there is little chance that indirect fire will damage the sites, it has not studied the effectiveness of these modifications. Stray fire might still damage archaeological sites. The SEA does not assess this risk. The lack of data on the potential impact on cultural, archaeological, and historical resources suggests that the FONSI may not have been grounded on sufficient information.

22. The Army asserts that cultural resources will be protected given the Programmatic Agreement with the Hawaii State Historic Preservation Office and the federal Advisory Council on Historic Preservation, entered into under section 106 of the National Historic Preservation Act, 16 U.S.C. § 470f. Although the Programmatic Agreement contains specific programs and efforts to protect and mitigate the impact on cultural resources at Makua Valley, the SEA does not assess the effectiveness of the measures required by the Programmatic Agreement. This uncertainty creates a serious question going to the merits of this case.

### Controversy.

23. "The existence of a public controversy over the effect of an agency action is one factor in determining whether the agency should prepare [an EIS]." *Greenpeace Action v. Franklin*, 14 F.3d 1324, 1333 (9th Cir.1992). "Agencies must prepare [an EIS] whenever a federal action is controversial, that is, when substantial questions are raised as to whether a project may cause significant degradation of some human environmental factor, or there is a substantial dispute [about] the size, nature, or effect of the major Federal action." *National Parks*, 241 F.3d at 736 (quotation omitted). "The existence of opposition to a use, however, does not render an action controversial." *Wetlands Action Network*, 222 F.3d at 1122. "A substantial dispute exists when evidence, raised prior to the preparation of an EIS or FONSI, casts serious doubt upon the reasonableness of an agency's conclusions." *National Parks*, 241 F.3d at 736 (internal citations omitted). "NEPA then places the burden on the agency to come forward with a 'well-reasoned explanation' demonstrating why those responses disputing the EA's conclusions do not suffice to create a public controversy based on potential environmental consequences." *Id.*

### Native Hawaiian Cultural Practices.

24. The Army received numerous objections during the comment period regarding the SEA's failure to properly account for the impact of proposed training activities on Native Hawaiian cultural rights, such as rights to gather plants and animals. These objections cast doubt on the adequacy of the SEA. *See National Parks*, 241 F.3d at 736 (finding public controversy when the comments submitted show that an EA is incomplete and mitigation is uncertain). Malama Makua has therefore raised serious questions going to the merits of this issue.

*Potential Contamination.*

25. Malama Makua argues that there is a substantial dispute about whether contamination is likely of groundwater, surface water, and soil, given the Army's past hazardous waste practices and its proposed resumption of live-fire training. Malama Makua points to an independent report submitted during the comment period by Dr. Mary Masters that criticizes the Army's heavy reliance on the Halliburton Study in its finding of no significant impact. Malama Makua contends that the SEA's failure to address the report undercuts the Army's decision not to prepare an EIS.

26. The Army argues that, as the proposed training does not involve hazardous waste disposal, the Army was not required to consider critiques of studies concerning the effects of past hazardous waste disposal practices at Makua Valley. The Army asserts that the community's concerns over hazardous waste contamination stem mainly from the Army's past use of the OB/OD unit. Because OB/OD hazardous waste operations are not a part of the proposed action, the Army concludes that the SEA does not have to address potential hazardous waste contamination.

27. The Army concedes, however, that live-fire training at MMR will introduce small amounts of hazardous waste into Makua Valley. *See* Defendants' Memorandum in Opposition to Plaintiff's Motion for Preliminary Injunction (June 21, 2001) at 23. NEPA requires an EIS if an action is "related to other actions with individually insignificant but cumulatively significant impacts." 40 C.F.R. § 1508.27(b)(7). Under NEPA, the Army is required to analyze the potential hazardous waste threats from the proposed training activities in conjunction with the impact of past activities at MMR. *See* 40 C.F.R. § 1508.7 (defining "cumulative impact" as "the impact on the environment which results from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions").

28. In fact, the SEA considers the impact of past hazardous waste disposal in determining the cumulative impact of the proposed action. *See* SEA at 123–30. The SEA bases its finding of no significant cumulative impact from the threat of hazardous waste contamination in part on the Halliburton Study. Because the Army relied on the Halliburton Study in addressing the cumulative impact of hazardous waste practices and in finding no significant impact from the cumulative effect, the Army should have addressed Dr. Masters' critique of the Halliburton Study. *See National Parks*, 241 F.3d at 736 (holding that a "substantial dispute exists when evidence, raised prior to the preparation of an EIS or FONSI, casts serious doubt upon the reasonableness of the agency's conclusions"). Dr. Masters' report was relevant to the proposed action reviewed in the SEA and FONSI.

29. The omission of any discussion of Dr. Masters' review of the Halliburton Study lends weight to Malama Makua's claim that the Army failed to take the requisite "hard look" at the environmental consequences of live-fire training. On this motion, the court cannot say that the SEA presents a "well-reasoned explanation" as to why Dr. Masters' review was ignored. *See LaFlamme v. Federal Energy Regulatory Comm'n*, 852 F.2d 389, 401 (9th Cir. 1988). Accordingly, there is a serious question going to the merits of this issue.

*The Balance of Harms Tips Sharply in Favor of Malama Makua.*

30. As the Supreme Court stated in *Amoco Prod. Co. v. Village of Gambell*, 480 U.S. 531, 107 S.Ct. 1396, 94 L.Ed.2d 542 (1987):

Environmental injury, by its nature, can seldom be adequately remedied by mon-

ey damages and is often permanent or at least of long duration, i.e., irreparable. If such injury is sufficiently likely, therefore, the balance of harms will usually favor the issuance of an injunction to protect the environment.

*Id.* at 545, 107 S.Ct. 1396.

31. The potential threat of wildfires that live-fire training poses to endangered species in Makua Valley provides significant grounds for injunctive relief. The Army's consultation with FWS has identified 30 endangered species that the proposed live-fire training at MMR threatens with extinction. The risk of extinction to these species is great because they do not satisfy FWS's criteria for "stability." Because the species are not stable, the loss of a single individual could result in the extinction of the species no matter what management actions are taken for the remaining individuals. At a minimum, the loss of a single specimen might preclude the potential for the species to recover. Because the court affords first priority to the declared national policy of saving endangered species, an injunction is warranted to prevent potential harm to, or extinction of, endangered species in Makua Valley. *See Tennessee Valley Auth. v. Hill,* 437 U.S. 153, 185, 98 S.Ct. 2279, 57 L.Ed.2d 117 (1978) (noting that the ESA requires "agencies to afford first priority to the declared national policy of saving endangered species").

32. The additional risks of an adverse environmental impact on Native Hawaiian cultural resources and Native Hawaiian rights, coupled with the Army's failure to at least review Dr. Masters' report on contamination, compels the issuance of an injunction on live-fire training exercises at MMR pending resolution of this action on the merits. *See National Parks,* 241 F.3d at 737 (stating that injunctive relief is appropriate when the proposed project may have an impact on some human environmental factor).

33. Although the court recognizes the importance of national security and live-fire training, the potential harm to the Army resulting from a brief preliminary injunction will not be significant. The Army argues that the continued reduction in CALFEX training will place the lives of soldiers at risk and will negatively affect national security. However, several other training sites are available to the Army to conduct CALFEX training pending resolution of this case on the merits. While the other training sites may not be as accessible and may cost more for the Army, financial harm is "not the sort of 'unusual circumstance' that justifies a court's refusal to enjoin NEPA violations." *Greenpeace Found. v. Mineta,* 122 F.Supp.2d 1123, 1139 (D.Haw.2000); *see also Idaho Sporting Congress v. Alexander,* 222 F.3d 562, 569 (9th Cir.2000) (noting that possible financial hardship was outweighed by irreparable environmental harm). There is no evidence in the record to indicate that training at other sites pending resolution of this case will significantly impair the ability of the Army to defend the nation. Arguments were made by counsel regarding morale and other effects of training at other sites, but nothing in the record supports these arguments.

34. The court notes that the Army voluntarily suspended live-fire training exercises at MMR in 1998 and has not trained there for almost three years. In December 2000, the Army issued a "final" EA and FONSI, but subsequently withdrew it to address community concerns. This voluntary withdrawal caused a five-month delay in this case. The Army cannot now come into this court and say that national security will be jeopardized by a delay of a few months to determine this case on the merits. Training has not occurred at

MMR for almost three years; another few months will not cause irreparable harm. Accordingly, the balance of harms tips sharply in favor of Malama Makua.

### The Public Interest Favors Malama Makua.

35. The Army argues that "[a]lthough there is no national defense exception to NEPA, ... the national well-being and security as determined by the Congress and the President demand consideration before an injunction should issue for a NEPA violation." *Wisconsin v. Weinberger*, 745 F.2d 412, 425 (7th Cir.1984). The court recognizes that the public has a substantial interest in the national well-being and security of the nation. However, a preliminary injunction in this case will not significantly impair the public's interest. As noted above, the Army has not demonstrated that significant harm will result from the imposition of a brief preliminary injunction.

36. The public also has a significant interest in the protection of endangered species, cultural resources, Native Hawaiian rights, and the environment of Makua Valley. Without a preliminary injunction, this interest may be harmed. The potential threat of wildfires and live-fire training may cause the extinction of endangered species, the loss of cultural resources, the denial of Native Hawaiian rights, and adverse effects on the environment. Malama Makua deserves the chance to be heard on the merits of this case before the Army begins live-fire training exercises that may threaten the environment. The public interest therefore favors the issuance of a relatively short preliminary injunction.

### CONCLUSION.

The record before the court demonstrates that: (1) there are sufficiently serious questions going to the merits of this case; (2) the balance of hardships tips decidedly in favor of Malama Makua; and (3) the public interest favors granting a preliminary injunction. Malama Makua is therefore entitled to a preliminary injunction. The Army is enjoined from conducting the proposed live-fire military training at MMR pending the court's final disposition of the merits of this case.

In light of this ruling, the court sets an accelerated schedule for dispositive motions in this case. The court directs the Army to file the administrative record in this case by August 10, 2001. Either side may file a motion for summary judgment. The hearing on such matter will be set for 9:00 a.m. on October 29, 2001. The motions shall be filed and briefed in accordance with the deadlines set forth in the Local Rules.

If this case is not entirely disposed of on the motions that will be argued on October 29, 2001, either party may ask the court to review the propriety of extending or dissolving this preliminary injunction.

IT IS SO ORDERED.